## MERVIN ADELSON; NATHAN ADELSON, Also Known as N. Adelson, Appellants, v. Wilson & Co., Inc., a Corporation, Respondent.

No. 4783

January 14, 1965                    398 P.2d 106

*Lionel & Gunderson*, of Las Vegas, for Appellants.

*Coulthard & Smith*, of Las Vegas, for Respondent.

## OPINION

By the Court, BADT, J.:

Mervin and Nathan Adelson have appealed from a judgment entered against them by Wilson & Co., respondent herein, based upon two written guaranties of payment to Wilson for goods, wares, and merchandise

sold to Adelson, Inc. The guaranties executed, respectively, by Mervin and Nathan Adelson guaranteed "prompt and punctual payment to Wilson & Co., Inc., of any account now owing from purchaser and for all goods, wares and merchandise hereafter sold and delivered by Wilson & Co., Inc., to said purchaser." The guaranty also included the following provision: "The records of Wilson & Co., Inc., shall be conclusive with respect to the amounts, times and places of delivery of any and all merchandise, and the balance due and owing to Wilson & Co., Inc., by said purchaser."

The issues presented to the court below were (1) whether the merchandise in question had actually been sold and delivered by Wilson & Co. to Adelson, Inc.; (2) whether the liability of the two Adelsons upon their respective guaranties was discharged by Wilson & Co.'s acceptance of stock in Reorganized Fox Markets pursuant to a bankruptcy reorganization plan; and (3) whether the respondent Wilson & Co. was precluded from maintaining a suit in this state under the provisions of NRS 80.210, because it was engaged in intrastate business in Nevada.

The court below made findings in part as follows:

"6. That between the 21st day of February, 1961, and the 26th day of April, 1961, the plaintiff, in reliance upon each of the aforesaid Guaranties, sold and delivered to Adelson, Inc., meat and meat products, the reasonable value of which was the sum of $13,942.17.

\* \* \* \* \*

"11. That none of the meats and meat products for which recovery is sought by plaintiff were sold or delivered by plaintiff to Fox Markets, Inc., a California corporation.

\* \* \* \* \*

"13. That in March, 1961, Adelson, Inc. filed its Petition for Arrangement under Chapter XI of the Bankruptcy Act, but that no Plan of Arrangement was ever confirmed under said Chapter.

"14. That on March 7, 1962 said Adelson, Inc. filed

its Petition in the U.S. District Court, District of California, Central Division, under Chapter X of the Bankruptcy Act, and that the said Petition was approved by that Court on March 7, 1962.

"15. That plaintiff's claims, which constitute the basis for this action, were set forth in the debtor's schedules thereunder.

"16. That a Plan of Reorganization was approved and filed in said Court in December, 1962, which provided in part:

" '(d) In full satisfaction and extinguishment of their claims unsecured creditors will receive one share of stock of the Reorganized Fox Markets, Inc., for each $25.00 of claims held.'

"17. That stock of the Reorganized Fox Markets, Inc. was issued to and received by the plaintiff which now holds the same."

Judgment was accordingly entered against Mervin and Nathan Adelson for $13,942.17, together with an attorney fee and costs. On appeal to this court it is asserted that findings No. 6 and No. 11 are without support in the evidence and that the evidence establishes the fact that the meat was sold and delivered to Fox Markets, Inc.

As we hold that the appeal is well taken and that the judgment must be reversed on the first assignment of error, it is unnecessary for us to pass on the further assignments.

The evidence developed many facts not included in the court's formal findings and it becomes necesary to consider such facts.

In December, 1959, Nathan and Mervin Adelson sold their stock in Adelson, Inc., to Fox Markets, Inc., a retail chain of grocery stores with its principal office in Los Angeles. The Adelsons resigned as officers and directors of the corporation and Nathan Adelson became the general manager of the three Las Vegas stores. After the stores were sold to Fox Markets, Inc., they were absorbed into the Fox chain of stores. The names of the stores were changed to Fox Market Town, and

each store was given a "Fox" number by which it would be known throughout the chain of stores, namely, Fox Stores Nos. 62, 63, and 64.

The meat sold in these three stores was supplied by Wilson & Co., both before and after the sale of stock to Fox Markets, Inc., but the procedure by which the meat was ordered and paid for was entirely different. When the Adelsons were the stockholders, meat orders were sent from Las Vegas directly to Wilson & Co. in California who delivered the meat ordered to the Las Vegas stores as indicated. Payment was made by Nathan Adelson by check from Las Vegas. After control of the corporation was assumed by Fox Markets, Inc., meat was no longer bought from Wilson & Co.'s local salesman. This was because of Wilson's credit policy concerning chain stores which required all chain store orders to be placed directly through the beef department.

After Fox Markets, Inc., assumed control of the corporation, meat orders were placed by the manager of the meat department of the three Las Vegas stores to Fox's Los Angeles office. Fox's central buying office in Los Angeles would then place a bulk meat order by phone to Wilson & Co. for both California and Las Vegas stores. (Such "Las Vegas stores" as here and later referred to were in reality Fox Stores Nos. 62, 63, and 64.) A Fox meat buyer would then go to Wilson's plant and would inspect and select the meat, accepting the meat by stamping the side of the meat with a stamp that said "Fox" on it. The buyer would later phone the Wilson plant and tell how the meat was to be distributed. In other words, he instructed as to the stores to which the meat should be sent. An invoice for each store was prepared which showed what meat was to be distributed to that store. After the invoice had been approved by Wilson & Co.'s credit department, the invoice was sent with the meat to the proper store. The invoices for the Las Vegas stores recited that the meat had been sold to "Fox," "Fox Markets," "Fox Market Town," or "Market Town, Inc." These invoices were

receipted by the Las Vegas stores by a fox-head receipt stamp and a signature.

After the sale of control, Wilson & Co. sent weekly statements for all merchandise it shipped to the Las Vegas stores to the executive accounting offices of Fox Markets, Inc., in Los Angeles. Payment for merchandise Wilson shipped to these three stores was made by checks payable by Fox Markets, Inc., and signed by Edwin J. Fox. And after December, 1959, the ledger cards of Wilson & Co. representing the three Las Vegas stores were changed so that the address of Adelson, Inc., was not the former Las Vegas address, but Fox Markets, Inc.'s address in Los Angeles.

On March 7, 1962, Fox Markets, Inc., Adelson, Inc., and other corporations in the Fox chain of stores filed petitions for reorganization under Chapter X of the Bankruptcy Act. Fox Markets, Inc., was treated as the principal debtor and the other corporations, including Adelson, Inc., were called subsidiaries. A Plan of Reorganization was approved under which the unsecured creditors were to receive one share of stock in Reorganized Fox Markets for each $25 of claims held, "in full satisfaction and extinguishment of their claims." The debt which is here in controversy was presented and approved, and Wilson & Co. was given its proper amount of shares of this stock.

Article I of the Plan of Reorganization stated that the *present debtor* Fox Markets, Inc., owns all the capital stock of the other debtors. Much *of the credit granted to the subsidiary debtors was granted in reliance upon the financial position of the principal debtor Fox Markets, Inc.* The accounting work of the debtors was administered by a central accounting office of Fox Markets, Inc., and it is believed that payment of liabilities was made out of any funds available *without regard to the origination thereof among the several debtors,* and that it would be difficult (if not impossible) and inordinately expensive to account for the assets and liabilities of the several debtors separately and to trace the status of the intercompany accounts between them. It

was further provided *that the debtors would be treated as a single debtor and administered as a single estate for all purposes in relation to the plan.*

Many pages are devoted to the treatment of the secured creditors. The principal provision with reference to unsecured creditors was as follows: "In full satisfaction and extinguishment of their claims, unsecured creditors of the Debtors shall receive one share of the common stock of the Reorganized Fox Markets, Inc. for every $25.00 of unsecured claim held by them as approved and allowed, or otherwise determined by the Court." It is admitted that Wilson & Co. received stock of the Reorganized Fox Markets, Inc., in accordance with the plan.

Respondent makes much of the point that "the trial court was aware of the fact that the claim of Wilson & Co. was listed as a debt of Adelson, Inc." No part of the bankruptcy record in evidence substantiates this. That part of the bankruptcy record in evidence, comprising the reorganization plan as proposed, definitely indicates that Fox Markets, Inc., was the principal debtor and that all other corporations, including Adelson, Inc., were subsidiaries.[1]

Respondent also makes much of the fact that the witness Bergman testified that the invoices upon the items involved herein reflected that the meat in question had been sold and delivered to Adelson, Inc. But it appears definitely that Bergman was the credit manager of Wilson and had no knowledge of deliveries. The court was interested in Bergman's testimony. It inquired: "How do you know the merchandise was delivered, if you know? You testified that you did. How do you know that it was?" The witness's answer, if it meant anything, meant that he didn't know of his own knowledge.

After pointing out these items, respondent states:

"Respondent will not waste the time of the court cataloguing the record to substantiate the obvious fact that while some of the evidence was conflicting, there

---

[1]See later discussion of the identification of the three Adelson stores as part of the Fox chain of from 50 to 60 stores.

was more than adequate evidence to support the Findings of Fact which appellants assert are erroneous."

Respondent having thus elected not to "waste the time of the court" in pointing to the places in the record where there would be found evidence to support the finding that the meat had been sold and delivered to Adelson, Inc. (in violation of the rule requiring such reference to the record), the court has of necessity been forced to examine the entire record to see if the finding of sale and delivery of the meat to Adelson, Inc., was supported. All it could find was to the contrary.

Respondent does not question the general principle that a guarantor's liability is strictly construed and its specific application that liability will not be extended beyond the precise provisions of his guaranty to include a principal other than the one expressly named therein. See Horton v. Ruhling, 3 Nev. 498, 503; Quillen v. Arnold, 12 Nev. 234, 244; Truckee Lodge v. Wood, 14 Nev. 293, 310.

After the transfer of all the stock of Adelson, Inc., to Fox and the withdrawal of Mervin and Nathan Adelson as officers and directors of Adelson, Inc., and their being supplanted by the officers of Fox Markets, Inc., and the ordering of meat from Wilson & Co. by Fox Markets, Inc., the credit status of the latter was examined by Wilson & Co. Wilson's credit manager testified that after the examination of Fox's credit status, Wilson increased the credit rating of Adelson, Inc., without obtaining any financial statement from either of the individual Adelsons.

It should be noted that two of Wilson's employees thought that a bulk sale was completed to Fox before instructions concerning distribution were ever given. J. J. Barton, Wilson's key account salesman for chain stores, testified that the order would come into his office, he and Fox's buyer coming to terms on price and quantity. Then he would notify Wilson's production department and tell them to get this order ready. Thereafter, Fox's buyer would call Wilson & Co. and give instructions as to how the meat was to be distributed

among their many stores. But when J. J. Barton took the initial order, he considered the sale consummated. Barton testified: "I made the sale. It was a bulk sale. The order department at Wilson was breaking down this large sale made to all the stores at Fox Markets. When I got this order from Kramer or one of those assistant buyers in there I just knew it would go to one of their stores, but not how much of the order would go." And Charles A. Barbour, manager of Wilson's beef, lamb, and veal department, testified that he considered the sale was made to Fox once Fox's buyer came over and accepted the meat which was ordered in bulk by placing the Fox stamp on the meat. He would put the stamp on each quarter in violet ink to establish acceptance and at that time the sale was made of that particular animal. It seems clear that in each of such sales the sale was made to Fox Markets, Inc., and Fox would send the meat to various of its stores. These included the three Adelson stores which were then Fox stores Nos. 62, 63, or 64. All payments for meat shipped to the Las Vegas stores were made by Fox Markets, Inc., by checks signed by Edwin Fox.

Respondent relies on a combination of two circumstances to substantiate evidence of a sale to Adelson, Inc. The first circumstance is the provision in the guaranty which states: "The records of Wilson & Co., Inc. shall be conclusive with respect to the amounts, times and places of delivery of any and all merchandise, and the balance due and owing to Wilson & Co., Inc. by said Purchaser."

The second circumstance grows out of the ledger sheets admitted in evidence in behalf of the plaintiff. These were offered to show that Wilson had actually charged to Adelson, Inc., shipments of meat over a period from February to April, 1961. They consist of five sheets itemized on both sides. Commencing in February, 1960, the first sheet shows charges to "Adelson, Inc., dba Market Town, address 22 E. Oakey Blvd., Las Vegas, Nevada," with such address inked out and changed in ink to read 4411 W. Slauson Ave., Los Angeles 43, California. The Slauson address is admitted to be

the main office of Fox Markets, Inc. On the other side of the same ledger sheet the typed words "Adelson, Inc., dba" are scratched out in pencil leaving the name simply as "Market Town." Other cards give the name as Adelson, Inc., or Adelson, Inc., Market Town, but all give the address 4411 W. Slauson, Los Angeles, California. Without the clause in the contract that the records of Wilson & Co. shall be conclusive not only as to the amounts, times, and places of delivery, but also as to the balance due and owing to Wilson & Co. by the purchaser, one would be inclined to conclude that the charges, although made to Adelson, Inc., were directed against Fox Markets, Inc., because the statements were sent to their address.

We are thus lead to the effect of the contract clause as quoted. The authorities seem to be equally divided as to the legal effect of such a clause. Professor Wigmore sees no danger in it. Arnold, in his work on Suretyship & Guaranty, and Stearns on Suretyship hold such clause to be void as against public policy. The matter is discussed at some length in the annotation in 68 A.L.R. 330 with reference to the validity of such stipulation. The annotation follows the case of Fidelity & Deposit Co. v. Davis, 129 Kan. 790, 284 P. 430, 68 A.L.R. 321, which contains an extensive discussion of the entire subject and of the conflicting cases. The question of public policy is fully discussed. The court finally adopts the view that an agreement of this nature between the principal and surety is void as against public policy. "A person cannot waive the protection which the law affords. The surety cannot, by his ex parte acts, conclusively determine his own cause of action. The courts cannot have rules of law prescribed by acts of the parties." Fidelity & Deposit Co. v. Davis, 284 P. 430, 432, quoting Arnold on Suretyship & Guaranty § 231 (1927).

The court cites with approval Stearns on Suretyship § 242 (3d Ed. 1922), as citing the result of validating such clauses: "* * * the common law right of indemnity is thereby enlarged, as the amount recoverable is no longer the amount due as shall be ascertained by judicial

determination, but such sum as the surety may pay to the creditor, whether more or less than the sum due."[2] We are convinced by the reasoning of the Kansas court that the view taken by it is the correct one, and that the clause in question is void on the grounds of public policy. By reason of this conclusion, the uncertainty of the ledger sheets causes them to lose all their persuasiveness in view of the other evidence in the case. The testimony of the employees of Wilson & Co., Inc., following the taking over of Adelson, Inc., by Fox, with regard to the bulk sales made to Fox Markets, Inc., for distribution to all of the Fox Stores, which included the three Las Vegas stores, cannot be explained away. This conclusion is strengthened by the recitals in the Reorganization Plan and by Wilson's acceptance of stock of Reorganized Fox Markets by reason of its acknowledged status as an unsecured creditor.

The guaranties signed by Mervin Adelson and Nathan Adelson for the payment of meat sold to Adelson, Inc., cannot be extended to meat sold to Fox Markets, and we are accordingly compelled to reverse the judgment for that reason.

The judgment is reversed with costs, and remanded to the court below with directions to enter a judgment in favor of appellants, defendants below.

McNAMEE, C. J., and THOMPSON, J., concur.

---

[2]On the same point the Supreme Court of Kansas in Dearborn Motors Credit Co. v. Neel, 184 Kan. 437, 337 P.2d 992, some 29 years later, similarly disposed of the plea of such clause by saying that it was not raised in the court below.